UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

Anthony Carpenito

     v.                               Civil No.09-cv-059-JL

William Wrenn, Commissioner,
New Hampshire Department of
Corrections, et al.[1]

**REPORT AND RECOMMENDATION**

Before the Court is Anthony Carpenito's complaint (document

nos. 1 & 4-6)[2], filed pursuant to 42 U.S.C. § 1983, alleging that

---

[1]In addition to Wrenn, Carpenito has named the following New Hampshire Department of Corrections employees as defendants to this action: Corrections Officer ("C.O.") Dunn (first name unknown ("FNU")), C.O. Brandon Westgate, Counselor Sue Taylor, C.O. FNU Duguay, C.O. FNU Morrison, C.O. FNU Betteze, C.O. FNU Hillsgrove, C.O. FNU Labonty, Lt. FNU Greenwald, C.O. FNU Turcout, Investigations Officer FNU Weefers, Unit Manager Kathleen Anderson, New Hampshire State Prison Warden Richard Gerry, Northern New Hampshire Correctional Facility ("NCF") Warden Larry Blaisdell, Unit Manager Robert Thyng, Sgt. Elmer Sevier, Mjr. Dennis Cox, NCF Media Generalist Angela Poulin, Lt. FNU Emerson, Cpl. Shane Mailhot, Sgt. FNU Moran, C.O. FNU Lemieaux, C.O. FNU Gosslin, C.O. FNU Donnally, and Lt. FNU Gagnon.

[2]In addition to his complaint (document no. 1), Carpenito filed three addenda to his complaint (document nos. 4-6). I will accept the addenda and the four documents will be considered, in the aggregate, to be the complaint in this matter for all purposes.

his federal constitutional rights have been violated by the
defendants, who have placed him in danger, used excessive force
against him, verbally threatened him, harassed him, denied him
access to the courts, and retaliated against him during his
incarceration.[3]  The matter is before me for preliminary review
to determine, among other things, whether or not the complaint
states any claims upon which relief might be granted.  See United
States District Court District of New Hampshire Local Rule ("LR")
4.3(d)(2); 28 U.S.C. § 1915A(a).

### Standard of Review

Under this Court's local rules, when an incarcerated
plaintiff commences an action pro se and in forma pauperis, the
Magistrate Judge is directed to conduct a preliminary review.  LR
4.3(d)(2).  In conducting the preliminary review, the Court
construes pro se pleadings liberally, however inartfully pleaded.
See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam)

---

[3]Carpenito first filed this matter on January 23, 2009 as a
petition for a writ of habeas corpus.  See Carpenito v. Wrenn,
Civ. No. 09-cv-021-SM (D.N.H.).  Because Carpenito raised both
habeas and civil rights claims in his petition, by Order issued
on February 25, 2009, I directed that the Clerk's Office treat
the existing case as a petition for a writ of habeas corpus, and
open this action based on the civil rights claims in the habeas
petition, which also serves as the complaint in this matter.
Accordingly, in this preliminary review, I address only the facts
and claims in the complaint relevant to the § 1983 action.

(following Estelle v. Gamble, 429 U.S. 97, 106 (1976), to
construe pro se pleadings liberally in favor of the pro se
party).  "The policy behind affording pro se plaintiffs liberal
interpretation is that if they present sufficient facts, the
court may intuit the correct cause of action, even if it was
imperfectly pled."  Ahmed v. Rosenblatt, 118 F.3d 886, 890 (1st
Cir. 1997); see also Castro v. United States, 540 U.S. 375, 381
(2003) (courts may construe pro se pleadings to avoid
inappropriately stringent rules and unnecessary dismissals).
The court must accept as true the plaintiff's factual assertions,
see Erickson, 551 U.S. at 94, and any inferences reasonably drawn
therefrom.  See Centro Medico del Turabo, Inc. v. Feliciano de
Melecio, 406 F.3d 1, 5-6 (1st Cir. 2005); Ayala Serrano v. Lebron
Gonzalez, 909 F.2d 8, 15 (1st Cir. 1990).  This review ensures
that pro se pleadings are given fair and meaningful
consideration.  Applying this standard, I find the facts as
follows.[4]

---

[4]The facts, as related, are gleaned from Carpenito's
complaint.  On March 11, 2009, a hearing on Carpenito's request
for a preliminary injunction was held before me.  The hearing was
stayed after the testimony of several witnesses had been
presented.  Before the hearing recommenced, plaintiff withdrew
his motion for injunctive relief.  I therefore did not make or
issue any findings in the matter.  I note that some of the
testimony presented by witnesses at the hearing contradicts the

## Background

1993 – 2001[5]

On May 18, 1993, Anthony Carpenito was sentenced to serve 1–
10 years in prison on a theft charge.[6]  Carpenito was released on
parole on August 16, 1993.  On December 15, 1999, Carpenito was
returned to the New Hampshire Department of Corrections ("NHDOC")
on a parole violation.  During this incarceration, Carpenito
worked in the prison kitchen.  In the kitchen, Carpenito was
approached by two individuals, an inmate and a corrections
officer, who invited him to participate in an operation to

---

assertions in the complaint.  In relying on the complaint as the
source of background information for conducting preliminary
review, I make no comment on the credibility of the witnesses or
evidence presented by either party at the hearing.  I am simply
applying the appropriate standard of review, as set out in this
Report and Recommendation, to determine whether or not the facts
as alleged in the complaint state any claim upon which relief
might be granted.

[5]Carpenito does not seek relief for incidents that occurred
between 1993 and 2001, but provides information about what
happened during that time as contextual history necessary to an
understanding of his current claims.  In any event, any claim
arising out of conduct that occurred prior to or during 2001
would undoubtedly be barred by the three-year statute of
limitations applicable to § 1983 cases.

[6]At the time of his initial incarceration, Carpenito's name
was Daniel Benzing.  His name has since been legally changed to
Anthony Carpenito, and I will therefore refer to him as such for
the sake of clarity.

smuggle contraband into the prison.  Carpenito refused to get involved.  Shortly thereafter, Carpenito was fired from his kitchen job.  A few weeks later, Carpenito was assaulted. Believing that his firing and the assault were connected to his refusal to participate in the smuggling operation, Carpenito contacted the NHDOC Investigations Department ("Investigations"). The Investigations staff asked Carpenito to work with them to investigate the smuggling operation.  Carpenito reluctantly agreed.  Carpenito states that, as a result of his informing activities, he was assaulted several times by both inmates and corrections officers.

Carpenito further claims he was taken to the Secure Housing Unit ("SHU") at the New Hampshire State Prison in Concord ("NHSP") for two months in 2000, where he was beaten, left standing handcuffed in the shower for hours, left handcuffed in his cell for extended periods of time while an officer soaked his clothing and bedding in the toilet bowl and then left the items on the floor of the unit, outside of Carpenito's cell.  Numerous requests by Carpenito to see the SHU Unit Manager went unanswered.  Several weeks later, Carpenito spoke to a counselor about ongoing abuse by a number of officers, but no

action was taken, either against the offending officers, or to better protect him from abuse.

One evening in early 2001, while Carpenito was in SHU, an inmate in the next cell attempted to hang himself.  Brian Blackden from Investigations came to interview SHU inmates about the attempted suicide.  While Blackden was there, Carpenito told him about the ongoing abuse he was suffering.  The next morning, Carpenito was released from SHU and, shortly thereafter, was transferred to the Northern New Hampshire Correctional Facility ("NCF").

Once at NCF, Carpenito found that he was again subjected to assaults by inmates because he was an informant and, as a result, he lived in constant fear.  In July 2001, Carpenito was assaulted by Corrections Officer ("C.O.") Hillsgrove at NCF.  When Carpenito complained, he was instructed to file a formal statement with then-Warden Michael Cunningham.  Carpenito was hesitant to file a complaint, because he did not feel that the NHDOC administrators were adequately protecting him.  Once assured that he would be okay, however, he did give a short statement to NCF Lt. Greenwood regarding the assault.  Shortly thereafter, while waiting to be approved for release on home

confinement, Hillsgrove locked Carpenito in a holding tank for two hours, then pushed him up against the wall and threatened to hurt him for writing reports against officers.  While Carpenito was in the tank, his cell was searched, and his notes of various incidents of abuse by staff were confiscated.

On August 5, 2001, Carpenito went to Greenwood to report what had occurred, and that he was in fear of Hillsgrove.  The following day, Carpenito was transferred to the NHDOC's Lakes Region Facility.  On August 27, 2001, Carpenito was transferred back to the NHSP in order to be processed for release on home confinement.

While Carpenito was waiting to be picked up from the facility by his family, C.O. Turcout locked him into a cell, picked up his file, and read his family information aloud. Turcout then stated that he knew Carpenito had spoken to Investigations while he was at NCF and that he had informed on C.O.s.  Turcout told Carpenito to "have a nice life" and threw his file back down on the desk.  Carpenito perceived Turcout's words, along with his tone and demeanor, to be a threat to Carpenito and his family.

When Carpenito's family picked him up, he had them drive him immediately to a pay phone.  He called Investigations and spoke to a Mr. Weefers regarding what had happened with Turcout, and his fear of what might happen to him and his family.  Weefers promised to look into it.

One week later, Carpenito was on home confinement, living at his sister's home.  While there, he received a threatening phone call which he believes was from an NHDOC officer.  The caller warned Carpenito not to return to the prison, and to stay out of New Hampshire altogether.  Carpenito called Investigations and spoke to Weefers.  Carpenito asked Weefers to check on the status of a sentence reduction he had been promised.  Weefers said he wasn't sure what was going on in Carpenito's case.  Carpenito continued to try to contact Weefers after that conversation, but his messages weren't returned.  Carpenito eventually spoke to Blackden at Investigations, as he did not trust Weefers.  Blackden also said he did not know the status of Carpenito's case, and he would try to find out.  Blackden advised Carpenito not to discuss his case with anyone else in Investigations.

In September 2001, Carpenito received several more disturbing phone calls.  The phone calls caused excessive stress

8

in Carpenito's sister's home, as she and her husband were already dealing with the recent death of their child. As a result of the phone calls, Carpenito's brother-in-law told Carpenito that he would have to move out. On September 26, 2001, Carpenito called Blackden and said that because he was no longer allowed to live at his sister's home, he feared he might have to return to the prison, and that he could not handle that possibility. Carpenito then absconded, which, because he was legally in custody while on home confinement, was deemed an escape.

Carpenito alleges that the assistance he provided to the NHDOC and to law enforcement, resulted in the arrest and/or firing of several C.O.s. Carpenito has submitted a letter written by his attorney stating that Blackden both confirmed this information, and acknowledged that Carpenito had put himself at great risk when he provided information against C.O.s.

2007-2009

On March 12 or 13, 2007, Carpenito, who had been arrested on the escape charge, appeared in the New Hampshire Superior Court, where he was ordered to serve the remainder of his original sentence, and sentenced to an additional consecutive 2-5 year sentence on the escape charge. Blackden, who was no longer

working for the NHDOC and had become a private investigator,
appeared in court at Carpenito's sentencing and told the judge
that in 2000 and 2001, Carpenito provided substantial assistance
to NHDOC Investigations by providing information which helped to
uncover and prosecute illegal activity by inmates and officers,
and that his informant activities had placed Carpenito at great
risk of harm.  As a result, Blackden testified, Carpenito was
assaulted by both NHDOC staff and inmates.  Blackden further
testified that it would still be dangerous to send him back to an
NHDOC facility due to the reprisals to which he would inevitably
be subject.  The court, in imposing Carpenito's sentence,
expressed concern for Carpenito's safety in an NHDOC facility,
and directed in the sentencing order that Carpenito "be
immediately placed at a facility which will protect him from harm
from inmates and others."

Despite the sentencing court's order, Carpenito was sent to
the NHSP, where, Carpenito states, he was immediately seen by
C.O. Westgate at the intake unit at the NHSP, Reception and
Diagnostics ("R&D").  Westgate was one of the officers who had
abused Carpenito at the NHSP in 2000 and 2001.  Carpenito alleges
that during his first several weeks in R&D, Westgate would remove

him from his cell, take him downstairs to the 'wet tank' and verbally torment him by stating, in front of other officers, that Carpenito had "ratted on" Westgate and others in 2001.  Carpenito further describes incidents wherein Westgate entered his cell, handcuffed him, pushed him against the wall, and threatened him with physical harm.  Westgate would also announce in a loud voice, so that other inmates could hear, that Carpenito was a "P.C. rat."[7]  This placed Carpenito in physical danger, as inmates are known to act violently toward informants in prison. Carpenito became aware that other officers were hearing of his situation, as one officer told him that he had "made some real enemies," and that guys like him "don't last very long."

Carpenito states that he wrote to his attorney and to Investigations and advised them that he was in fear for his life, but that unnamed C.O.s interfered with his mail, and the letters never reached their destinations.  In late March 2007, Carpenito's attorney came to the prison to see him.  While Carpenito was meeting with his attorney, Westgate confiscated all of Carpenito's legal and personal documents from his cell.  After

---

[7]The term "P.C. rat" refers to an inmate who, by virtue of having provided information inculpating others to the prison administration, is in danger and therefore placed in protective custody status.

the attorney visit, Westgate grabbed Carpenito's arms, placed them behind his back, handcuffed him, slammed him into a wall, and stated: "You've been busy writing statements on officers I see." When Carpenito objected to Westgate going through his papers, Westgate shoved Carpenito's face into the wall, and said "I can do whatever I want you fucking rat," and then threatened to "drop" Carpenito, or place him back into the wet tank, if he opened his mouth again. A few minutes later, Westgate, while handcuffing Carpenito in his cell, asked him about his legal documents. When Carpenito wouldn't answer, Westgate grabbed his arms, smashed his shin into the back of Carpenito's knee, and yelled in Carpenito's ear that he was a rat because he had documents with someone else's name on them.[8] Westgate moved Carpenito to the tank. A few hours later, Carpenito was returned to R&D, and found that all of his property had been sent to Investigations. Two months later, most of his belongings were returned to him, although Carpenito alleges that some items were missing.

---

[8]Carpenito states that Westgate was looking at documents with the name Anthony Carpenito on them, and that Westgate understood plaintiff's name to be Daniel Benzing, as that is the only name the NHSP administration was willing to recognize at the inception of his 2007 incarceration.

Carpenito has attached two letters from his attorney to his complaint.  One notified Carpenito that the day after he was sentenced in March 2007, Blackden called William Wrenn, the Commissioner of the NHDOC, to advise him of the danger Carpenito would face in prison because he had been an informant.  Wrenn assured Blackden that Carpenito's safety would be protected as effectively and discreetly as possible.  Carpenito's attorney also sent a letter to NHSP Warden Richard Gerry notifying him of Carpenito's situation, advising him of Carpenito's name change, and warning him about the safety concerns that would arise from the use of his former name.  Carpenito alleges that despite knowing that use of his former name would present a threat to Carpenito's safety, John Vinson, the attorney for Wrenn, directed, on April 18, 2007, that Carpenito be identified by both names on NHDOC paperwork.  Accordingly, Carpenito claims, Wrenn, Gerry, and Vinson were aware of, and failed to remedy, serious threats to his safety.

R&D is a short-term housing placement for new inmates at the NHSP, where they are placed until they are ready to be classified and transferred to a regular housing unit in the prison system.[9]

---

[9]Based on my experience in prisoner cases, I am aware that placement in R&D generally lasts no more than 30-60 days.

13

While Carpenito was at R&D, however, no steps were taken to move him out of that unit.  In the first four weeks he was at R&D, Carpenito claims he made six requests to Investigations to be moved out of R&D because Westgate was there.  Carpenito received no response, which he believes is due to the interception of his request slips.  Carpenito sent letters to Blackden and to his attorney explaining that he was being held in R&D with Westgate, and that his attempt to receive assistance from Investigations had failed.

Carpenito was housed in R&D for approximately five and a half months.  During that time, Carpenito claims he was consistently subjected to abuse by Westgate and others.

Eventually Carpenito became aware that he was going to be sent to NCF.  Carpenito sent word to R&D Unit Manager Kathleen Anderson requesting a meeting with her to discuss his transfer to a safe facility, but she did not come to see him.  Carpenito wanted to speak to her because he felt that he would be in serious danger at NCF as Hillsgrove, a C.O. he had informed on, was still there.

On August 27, 2007, Carpenito was sent to NCF.  Within days of his arrival, Hillsgrove approached him and, in front of other

inmates, stated that he had heard Carpenito was returning and that word was out about him.  Hillsgrove told Carpenito, "You better watch yourself."

Carpenito spoke with his Unit Manager at NCF, Robert Thyng, about his concerns for his safety.  Shortly thereafter, Carpenito states that a number of inmates told Carpenito that they had heard from officers that Carpenito was an informant.  Carpenito requested protection in a safe facility from Thyng, who refused to help unless Carpenito provided him with names of individuals who posed a threat to his safety.  Thyng also advised Carpenito that placing him into protective custody would mean sending him to SHU at the NHSP.  Carpenito did not want to provide officers names to Thyng, for fear that Thyng would retaliate against him or the officers would hear that he had accused them, and he did not want to be sent back to SHU.  Carpenito therefore felt that Thyng would not help him.

Carpenito believed that, pursuant to the directive in his sentencing order, he should have been sent to a prison facility out of New Hampshire.  Carpenito spoke to NCF Warden Larry Blaisdell and discussed his safety issues with Hillsgrove at NCF,

15

and with his concern that he had not yet been transferred out of
state.  Blaisdell told Carpenito that he would look into it.

In the second week of September 2007, Carpenito was
assaulted by an inmate.  Carpenito reported the assault to Thyng,
and showed him the marks on his face and neck from the assault.
Carpenito told Thyng that officers were spreading rumors about
him in order to get inmates to assault him.  Thyng said that the

best he could do to protect Carpenito was to move him into
another unit in the same building.

Carpenito made several more requests to Thyng concerning his
safety.  In late October 2007, Thyng called Carpenito into his
office and told him that he was moving Carpenito to E-Unit.
Further, Carpenito was advised that his legal name would not be
used, that his birth name would be used, and that he should not
take any further action to attempt to have his legal name used at
the prison because it was too much paperwork to have his name
changed on everything.

Carpenito had a prison job between December 2007 and January
2008.  Carpenito claims that Hillsgrove constantly humiliated and
harassed him while he was doing his prison job by making

16

derogatory statements in front of other officers.  Hillsgrove
also told Carpenito not to get too comfortable at NCF.

On January 24, 2008, Sgt. Elmer Sevier approached Carpenito
and told him that he didn't want Carpenito working around NCF
staff, and fired Carpenito, falsely claiming that Carpenito had
been "unduly friendly" with NCF staff.  Sevier also sought to
have Carpenito denied his paycheck for the work he had done.
Sevier threatened to have Carpenito sent to SHU if he did not
drop the matter.

Later that day, NCF Lt. Loven asked Carpenito why he was not
working.  Carpenito relayed what had occurred to Loven and told
Loven that he felt he could not afford to make problems for
himself.  Loven restored Carpenito's job and said that although
Carpenito had been doing a great job, certain staff members were
looking for reasons to make his life at NCF difficult.

On April 23, 2008, Carpenito told Thyng that he wanted to
discuss a private matter with Mjr. Dennis Cox.  On April 30,
2008, Carpenito went to Cox's office to meet with him.  Thyng was
there.  Carpenito states that he did not want to talk to Cox
about his specific safety concerns in front of Thyng, but he did
tell both Thyng and Cox that he believed they understood his

situation, and that Hillsgrove and others were making it clear to him that he was receiving poor treatment from staff members because he was known to be an informant.  Thyng and Cox both told Carpenito that he had brought his troubles on himself.  Realizing he was not going to receive help from Thyng or Cox, Carpenito left the office.

In July 2008, Carpenito tried to have copies made of a motion he was filing in court seeking transcripts of his sentencing hearing.  Angela Poulin, the NCF librarian, refused to make copies of the motion because the caption on the motion referred to Anthony Carpenito, and not Daniel Benzing, and she believed that plaintiff's name was Benzing and that he was attempting to copy another inmate's paperwork.  Carpenito tried to discreetly explain his situation to Poulin, and that he is, in fact, Carpenito.  Poulin accused Carpenito of lying and wrote a disciplinary report against him for lying.  Poulin then had Cpl. Shane Mailhot remove Carpenito from the library.  Carpenito gave Poulin paperwork documenting that Carpenito was his real name, but she still refused to make copies for him, and told him to send his paperwork home to be copied.

Carpenito alleges that Sevier has stopped Carpenito and read his legal papers a number of times to see what he is working on in the law library.  On October 9, 2008, Carpenito was going into the law library to have copies made of legal materials and his written log of incidents with officers, assaults, and discussions with Thyng, Blaisdell, Cox, and Lt. Emerson.  Sevier stopped Carpenito, grabbed his folder, asked him what he had, and began to read his paperwork.  Carpenito said to Sevier that he wasn't supposed to read Carpenito's legal documents.  Mailhot was there and told Carpenito to shut his mouth or get "lugged to the tank." Sevier told Carpenito that he was in possession of unauthorized material because he had legal documents with someone else's name on them.  Sevier tried to seize these papers as evidence against Carpenito for a disciplinary write-up.  Carpenito said that Sevier had no authority to go through his legal papers, and that his actions amounted to harassment.  Mailhot said "Go ahead and open your mouth again I'm cuffing you and taking you to the tank."  Sevier took Carpenito's file, went to the library office, and shut the door.  Carpenito could see Sevier reading his papers while Poulin looked on.  Sevier then came out of the office and told Carpenito that he was in possession of unauthorized

materials and could not make copies.  Sevier ordered Carpenito
back to his unit, but Carpenito insisted on taking his folder of
papers with him.  Sevier eventually gave Carpenito the folder and
said to Mailhot: "He even had my name in that stuff."  Upon
reviewing the contents of the folder, Carpenito noticed that his
logs were gone.  Carpenito asked to see Thyng, but was told that
Thyng didn't want to see him and that he should file a request
slip.  Carpenito reported this incident to Sgt. Moran who called
Poulin.  Moran then told Carpenito "Sorry, you're beat.  Go back
to your unit."  Lt. Emerson agreed to look into Sevier's behavior
toward Carpenito.  A few days later, Carpenito was called to
Thyng's office.  Thyng told Carpenito that Sevier claimed to have
simply scanned the material.  Carpenito objected to Sevier's
version of events.  Carpenito also confronted Thyng with his
belief that Thyng was refusing to help him because of his
previously acting as an informant against NHDOC officers.

On December 16, 2008, Carpenito was in the law library
trying to access legal research he had done in the past which had
been saved on a computer.  Poulin, who knew Carpenito was
attempting to continue ongoing research, wouldn't allow him to
use the computer where his research was saved, and told him that

the information had been wiped out altogether.  Poulin again refused to make copies for Carpenito for court filing.  Carpenito told Poulin she was obstructing his access to the courts.  Poulin left the area and returned two minutes later with Mailhot, who ordered Carpenito to leave the library and return to his unit, or be handcuffed and taken to the tank.  Carpenito left the library and returned to his unit.

The next day, Carpenito received a disciplinary write-up from Poulin for causing a disturbance.  Carpenito was found not guilty at a disciplinary hearing held on December 23, as the only information presented at the hearing or in the write-up about the disturbance was that Mailhot had removed Carpenito from the library.

On December 23, 2008, after the disciplinary hearing, Carpenito stopped Blaisdell in the hallway and asked him why no steps had been taken to protect him from harm by transferring him out of state, despite his repeated requests, as he had been assaulted three times since he had been returned to the NHDOC. Carpenito told Blaisdell he lives in fear every day, stays in his cell all the time, and feels he can't safely go to work or to the gym.

On January 12, 2009, C.O.s Gosslin and Lemieaux went to
Carpenito's cell at 8:15 a.m. for a cell search, which was
conducted outside of Carpenito's presence and with the cell door
closed, which was not usual NHDOC practice for cell searches.
Carpenito asked to observe the search, but was denied.  Carpenito
looked into the cell through a window and saw Lemieaux reading
his legal documents.  Carpenito opened the cell door and politely
asked Lemieaux to stop reading the documents.  Lemieaux told
Carpenito to leave and Gosslin closed the door.  Carpenito then
saw Lemieaux flushing his legal documents and other notes down
the cell toilet.  After twenty-five minutes, Lemieaux and Gosslin
handcuffed Carpenito and called for other officers to respond to
assist them.  Carpenito told Lemieaux and Gosslin that he wanted
to see his legal documents and notes, and the contents of two
large trashbags full of papers that the officers were carrying
out of Carpenito's cell.  On Gosslin's instruction, the
responding officers took Carpenito to the tank.

Lt. Gagnon heard what had occurred and went to see Carpenito
in the tank.  Carpenito explained that he wasn't being loud or
disrespectful to the officers searching his cell, and that he
believed he was taken off of the unit to prevent him from

interfering with the removal of his legal materials from his
cell.  Gagnon took Carpenito out of the tank.  No disciplinary
report or write-up was issued regarding this incident.

Discussion

I.   <u>42 U.S.C. § 1983 Claims</u>

Section 1983 creates a cause of action against those who,
acting under color of state law, violate federal constitutional
or statutory law.  <u>See</u> 42 U.S.C. § 1983[10]; <u>Parratt v. Taylor</u>, 451
U.S. 527, 535 (1981) (<u>overruled on other grounds by Daniels v.
Williams</u>, 474 U.S. 327, 330-331 (1986)); <u>Wilson v. Town of
Mendon</u>, 294 F.3d 1, 6 (1st Cir. 2002).  In order for a defendant
to be held liable under § 1983, his conduct must have caused the
alleged constitutional or statutory deprivation.  <u>See</u> <u>Monell v.
Dep't of Soc. Servs.</u>, 436 U.S. 658, 692 (1978); <u>Soto v.
Flores</u>, 103 F.3d 1056, 1061-62 (1st Cir. 1997).  As Carpenito's

---

[10]42 U.S.C. § 1983 provides that:

> Every person who under color of any statute,
> ordinance, regulation, custom, or usage, of any
> State or Territory or the District of Columbia,
> subjects, or causes to be subjected, any citizen
> of the United States or other person within the
> jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the
> party injured in an action at law . . . .

23

claims allege violations of his federal constitutional rights by
state actors, they arise under § 1983.

II.  <u>Endangerment</u>

The safety and security of all prisoners is protected by the
Constitution.  <u>See</u> <u>DeShaney v. Winnebago County Dep't of Soc.
Servs.</u>, 489 U.S. 189, 190 (1989); <u>Youngberg v. Romeo</u>, 457 U.S.
307, 315-16 (1982).  To state a constitutional claim that
defendants endangered him, Carpenito must allege that the
defendants were aware of and deliberately indifferent to a
serious risk to his safety.  <u>See</u> <u>Burrell v. Hampshire County</u>, 307
F.3d 1, 7 (1st Cir. 2002).

Carpenito has alleged that his sentencing order advised
NHDOC officials that there was a substantial risk to his safety.
Carpenito has also stated that both Blackden and Carpenito's
attorney communicated directly with Wrenn and Gerry and advised
them that Carpenito was subject to a serious threat to his safety
in the state prison system.  Carpenito also states that he
himself, on may occasions, attempted to communicate with various
officials at the prison, including Wrenn, Gerry, Weefers,
Anderson, Thyng, Cox, and Blaisdell to try to alert them to his
safety concerns and to have his transfer to a safe facility

effected.  I find that these defendants were aware of the existence of a serious risk to Carpenito's safety, and still failed to place him in a facility where he would be safe.  As a direct result, Carpenito was subjected to assaults and other adverse actions by the "inmates and others" from whom his sentencing order directed that he be protected.

Carpenito also claims that Westgate endangered him by intentionally alerting both inmates and officers that Carpenito was an informant, or a "rat."  Westgate was certainly aware of the serious danger that such an allegation, in the prison context, created a very real and serious risk of physical harm to Carpenito, and accordingly, I find that Carpenito has sufficiently alleged that Westgate intentionally created a serious risk to his safety to allege a claim for endangerment, and I will direct that that claim proceed against him.

Carpenito further claims that he was endangered by the willful use of his birth name, despite defendants' knowledge that he had changed his name in order to protect himself from those who knew that he was informant.  Carpenito has stated sufficient facts to allow me to find, for purposes of preliminary review, that defendants Wrenn, Gerry, Blaisdell, Thyng, Cox, Anderson,

and Vinson, by virtue of the Superior Court order, information
from Carpenito's attorney and Blackden, and Carpenito's own
attempts to advise them of his name change and the reason
therefore, were aware of the danger in using Carpenito's birth
name in the NHDOC, and disregarded the risk.  This action,
Carpenito alleges, placed him in danger from officers aware of
his history.  In my Order issued simultaneously with this Report
and Recommendation (hereinafter the "Simultaneous Order"), I will
therefore direct service of endangerment claims on defendants
Wrenn, Vinson, Gerry, Blaisdell, Anderson, Thyng, Cox, Weefers,
and Westgate.

III. <u>Excessive Force</u>

     To state a claim for the use of excessive force by a prison
official under the Eighth Amendment, an inmate must demonstrate
"unnecessary and wanton infliction of pain."  <u>Whitley v. Albers</u>,
475 U.S. 312, 320 (1986).  In determining whether a plaintiff has
stated a claim for unconstitutionally excessive force, the court
should look to the following four factors: (1) "the need for
application of force," (2) "the relationship between the need and
the amount of force that was used," (3) "the extent of injury
inflicted," and (4) "whether the force was applied in good faith

to maintain or restore discipline or maliciously and sadistically for the very purpose of inflicting harm." Garcia v. City of Boston, 115 F. Supp. 2d 74, 81 (D. Mass. 2000), aff'd, 253 F.3d 147 (1st Cir. 2001).

The primary inquiry in determining whether prison officials used excessive physical force turns on "whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm," whether or not significant injury is evident. Hudson v. McMillian, 503 U.S. 1, 6-8, 10 (1992) (citing Whitley, 475 U.S. at 320-21). "That is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action." Hudson, 503 U.S. at 9. "Not every push or shove, even if it may later seem unnecessary . . . violates a prisoner's constitutional rights." Id. (internal citations omitted). The Eighth Amendment "excludes from constitutional recognition *de minimis* uses of physical force, provided that the force is not of a sort repugnant to the conscience of mankind." Id. at 9-10 (quoting Whitley, 475 U.S. at 327 and Estelle, 429 U.S. at 106).

Applying the Hudson standard and the factors set forth in Garcia to this case, I find that Carpenito alleges that

substantial force and physical punishment was utilized against
him when he was repeatedly slammed into a wall and kneed in the
back of the leg by Westgate.  Carpenito alleges that the force
was utilized because Westgate was angry about Carpenito's former
informing activities, and not because of anything Carpenito had
done that required force to maintain order or discipline.
Further, while Carpenito has not alleged a particular injury, his
complaint does allege that Westgate's actions were motived by his
desire to maliciously and sadistically inflict pain rather than
to achieve any penologically legitimate goal.  Accordingly, in my
Orders issued simultaneously with this Report and Recommendation
(hereinafter the "Simultaneous Order"), I will direct that
Carpenito's excessive force claim proceed against Westgate.

IV.  <u>Verbal Harassment</u>

     In general, nonphysical abuse or harassment does not invoke
constitutional protection.  <u>See</u> <u>Shabazz v. Cole</u>, 69 F. Supp. 2d
177, 198–201 (D. Mass. 1999) (citing authority to explain that
racial slurs and verbal threats do not violate a prisoner's
constitutional rights).  Carpenito alleges here that he was
threatened and harassed by Westgate, who would call him a "rat,"
both in his cell where the threat of immediate harm appeared real

28

to Carpenito, and in front of other officers or inmates, from
whom Carpenito also feared reprisal.  Additionally, Westgate
threatened Carpenito with physical harm while exerting physical
force on him, which served to emphasize the plausibility of
Westgate carrying out his threats.  Carpenito alleges that at NCF
he was similarly threatened and/or harassed by Hillsgrove,
Mailhot, and Sevier.

    Carpenito's assertions, which, if true, as I must assume
they are for purposes of conducting this preliminary review,
describe unprofessional and reprehensible conduct on the part of
the defendant C.O.s, fall short of establishing behavior that is
unconstitutional.  Accordingly, I recommend that Carpenito's
verbal abuse and harassment claims be dismissed from this action.

V.   Denial of Access to the Courts

    Under the Due Process Clause of the Fourteenth Amendment,
prison inmates enjoy a right of access to the courts.  See Bounds
v. Smith, 430 U.S. 817, 828 (1977); Lewis v. Casey, 518 U.S. 343,
350-51 (1996); Carter v. Fair, 786 F.2d 433, 435 (1st Cir. 1986).
States have an affirmative duty to ensure that inmates have
meaningful access to the courts.  See Bounds, 430 U.S. at 832-34;
Wolff v. McDonnell, 418 U.S. 539 (1974), Johnson v. Avery, 393

29

U.S. 483, 485 (1969); <u>Germany v. Vance</u>, 868 F.2d 9, 14 (1st Cir. 1989).  In order to assert a denial of meaningful access to the courts, an inmate must allege that he has suffered injury or prejudice to an underlying nonfrivolous legal action.  <u>Lewis</u>, 518 U.S. at 351; <u>Christopher v. Harbury</u>, 536 U.S. 403, 415 (2002). Without such an injury, no claim lies for a denial of access to the courts.  <u>Lewis</u>, 518 U.S. at 351; <u>Christopher</u>, 536 U.S. at 415.

Carpenito has alleged that officers Westgate, Lemieaux, Gosslin, Sevier, Mailhot, and Poulin have rifled through his legal paperwork, including his notes and written logs, that on one occasion in R&D items were taken from his cell, and that on January 12, 2009, Lemieaux and Gosslin removed legal papers from his cell.  Carpenito describes a number of incidents in which he was denied legal copies by Poulin, Mailhot, and Moran, denied access to his previous legal research by Poulin, had his legal documents gone through and, in some instances, confiscated, temporarily or permanently, by Sevier, Lemieaux, and Gosslin.

Carpenito does not state, however, that any legal action that he was entitled to pursue was adversely impacted by the actions alleged.  Accordingly, Carpenito has failed to allege

that he was denied access to the courts and I recommend dismissal of any such claim from this action.

VI.   Retaliation

Carpenito alleges that a number of actions were taken against him in retaliation for his prior informant activities. The alleged retaliatory acts include, but are not limited to: the use of physical force against him, verbal threats and harassment, use of his birth name, failure to transfer him to a safe facility, failure to process or answer his requests, tampering with his mail, confiscating his personal property and legal documents, issuing false disciplinary tickets, refusing to make copies, refusing to give Carpenito access to legal research, attempting to have Carpenito fired from his prison job, telling inmates and staff members that Carpenito was an informant, unnecessarily holding Carpenito in the tank for hours at a time, and conducting improper cell searches.  Carpenito alleges that these adverse acts were taken by defendants Wrenn, Gerry, Blaisdell, Gerry, Vinson, Weefers, Anderson, Thyng, Cox, Sevier, Poulin, Mailhot, Lemieaux, Gosslin, Westgate, and Hillsgrove.

Carpenito claims that he was retaliated against for exercising his First Amendment right to free speech and to access

the courts by providing testimony in a legal matter.  In order to
state a retaliation claim for an exercise of First Amendment
rights, an inmate must allege: (1) the conduct which led to the
alleged retaliation was protected by the First Amendment, (2)
some adverse action at the hands of the prison officials, and (3)
a causal link between the exercise of the inmate's First
Amendment rights and the adverse action.  See Price v. Wall, 464
F. Supp. 2d 90, 96 (D.R.I. 2006); see also McDonald v. Hall, 610
F.2d 16, 18 (1st Cir. 1979) (discussing pleading requirements for
retaliation claims by prisoners);  LaFauci v. N.H. Dep't of
Corr., No. Civ. 99-597-PB, 2005 WL 419691, at *7 (D.N.H. Feb. 23,
2004) (Unpublished Order); Mitchell v. Horn, 318 F.3d 523, 530
(3d Cir. 2003) ("[G]overnment actions, which standing alone do
not violate the Constitution, may nonetheless be constitutional
torts if motivated in substantial part by a desire to punish an
individual for exercise of a constitutional right."); Oropallo v.
Parrish, No. 93-1953, 1994 WL 168519, at *3 (D.N.H. May 5, 1994),
aff'd, 23 F.3d 394 (1st Cir. 1994) (citing Ferranti v. Moran, 618
F.2d 888, 892 n.4 (1st Cir. 1980) ("[A]ctions otherwise
supportable lose their legitimacy if designed to punish or deter

an exercise of constitutional freedoms.") (citation omitted)).  I

consider each of these elements of a retaliation claim in turn.

    A.   <u>Conduct Protected by the First Amendment</u>

        1.  <u>Free Speech</u>

The First Amendment protects an individual's right to speak

freely.  <u>See</u> U.S. Const. amend. I.[11]  Part of the free speech

right of ordinary individuals is the right to testify truthfully.

<u>See</u> <u>Franco v. Kelly</u>, 854 F.2d 584, 590 (2d Cir. 1988) (prisoner

stated valid § 1983 claim for retaliation by alleging that prison

officials filed false charges against him in retaliation for

exercising his right to testify); <u>see also</u> <u>Melton v. City of</u>

<u>Oklahoma City</u>, 879 F.2d 706, 714 (10th Cir. 1989) (the right to

appear and give true testimony as a witness in a legal proceeding

is guaranteed by the First Amendment's free speech clause);

<u>Langley v. Adams County</u>, 987 F.2d 1473, 1479 (10th Cir. 1993)

(same); <u>Reeves v. Claiborne County Bd. of Educ.</u>, 828 F.2d 1096,

1100 (5th Cir. 1987) (same).  Accordingly, I find that

Carpenito's actions in providing information in a legal

    [11]U.S. Const. amend. I states in relevant part:

        Congress shall make no law . . . abridging the
        freedom of speech, or of the press; or the right of
        the people peaceably to assemble, and to petition
        the Government for a redress of grievances.

investigation targeting smuggling in prison constituted an

exercise of Carpenito's right to free speech entitled to the

protection of the First Amendment.

> 2.   Petitioning the Government for Redress of
>       Grievances/Maintaining Right of Access to the
>       Courts

The right to petition the government for a redress of

grievances has been characterized as "among the most precious of

the liberties safeguarded by the Bill of Rights."  United Mine

Workers v. Ill. State Bar Ass'n, 389 U.S. 217, 222 (1967).  In

the prison context, this means that inmates must be "permit[ted]

free and uninhibited access . . . to both administrative and

judicial forums for the purpose of seeking redress of grievances

against state officers."  Sostre v. McGinnis, 442 F.2d 178, 200

(2d Cir. 1971) (en banc).  The First Amendment protects an

individual's freedom of speech in both oral and written form.

See  U.S. Const. amend. I; Palmigiano v. Travisono, 317 F. Supp.

776, 786 (D.R.I. 1970) (recognizing that the First Amendment's

protection extends to written correspondence to public officials

seeking to redress grievances or protest injustices).

As previously discussed, prison inmates have a right of

access to the courts.  See Bounds, 430 U.S. at 828; Lewis, 518

U.S. at 350–51.  A prisoner's right to access the courts has been
held to encompass the right to testify as a non-party witness in
a lawsuit.  See Gay v. Shannon, No. Civ.A. 02–4693, 2005 WL
756731, *8 (E.D.Pa. Mar. 1, 2005) ("[The Third Circuit] has
recognized the right [to testify as a non-party witness] exists
for members of the general population and it should be extended
to an inmate unless his confinement requires otherwise") (citing
Green v. Phila. Hous. Auth., 105 F.3d 881, 886 (3d Cir. 1997),
Worrell v. Henry, 219 F.3d 1197, 1204–05 (10th Cir. 2000), and
Smith v. Hightower, 693 F.2d 359, 368 (5th Cir. 1982) for the
proposition that the First Amendment protects a non-party
witness' right to testify truthfully at trial).

Carpenito has alleged that he exercised his First Amendment
free speech right, and right to petition the government for a
redress of grievances, by providing information as a non-party
witness in a legal matter.  I find that Carpenito has
sufficiently alleged that his statements to Investigations , an
addition to being an exercise of free speech, constituted a
petition to the government to redress grievances protected by the
First Amendment, and I find that Carpenito has alleged a First

Amendment right sufficient to meet the first requirement for
stating a retaliation claim.

     B.   <u>Adverse Action</u>

     To state an adverse action, plaintiff must allege that the
defendants subjected him to "conduct that would deter a similarly
situated individual of ordinary firmness from exercising his or
her Constitutional rights."  <u>Dawes v. Walker</u>, 239 F.3d 489, 493
(2d Cir. 2001), <u>overruled in part on other grounds by</u> <u>Phelps v.
Kapnolas</u>, 308 F.3d 180, 187 n.6 (2d Cir. 2002); <u>see</u> <u>Thaddeus-X v.
Blatter</u>, 175 F.3d 378, 398 (6th Cir. 1999).  Even if a particular
inmate is not chilled in his expression, a claim for retaliation
may still arise if the retaliatory behavior alleged is
objectively sufficient and onerous to deter an ordinary person
from exercising his rights.  <u>See</u> <u>Gay</u>, 2005 WL 756731, at *8
(citing <u>Allah v. Seiverling</u>, 229 F.3d 220, 225 (3d Cir. 2000)).
I find that the acts of retaliation that Carpenito alleges,
discussed in detail above, would tend to chill an inmate of
ordinary firmness to prevent an inmate with pertinent information
from sharing that information with law enforcement,
Investigations, or anyone else, for fear of suffering physical
harm, threats, or any of the other adverse acts described by

Carpenito.  Carpenito, therefore, has stated sufficient facts to allege that adverse actions were taken against him that would chill an ordinary inmate from exercising his First Amendment right to provide information or testimony, and has sufficiently alleged the second element of a retaliation claim.

      C.    <u>Causation</u>

Carpenito must allege facts that, if true, would demonstrate that the adverse actions alleged were taken in order to retaliate against him for the exercise of his First Amendment rights. Circumstantial evidence is often enough to support a claim that an adverse action was taken with retaliatory intent, as intentions are often difficult to prove through direct evidence. <u>See</u> <u>Beauchamp v. Murphy</u>, 37 F.3d 700, 711 (1st Cir. 1994); <u>Ferranti</u>, 618 F.2d at 892 (chronology of events provided support for inference of retaliation); <u>McDonald</u>, 610 F.2d at 18 (same). Here, however, Carpenito alleges facts that draw a direct causal line between the adverse treatment he received and the exercise of his First Amendment rights.  Specifically, Carpenito states that, along with the adverse actions, several of the offending officers made comments to him such as calling him a "rat," referring to his informing activities against officers, stating

37

that he had brought the adverse actions upon himself, or by removing legal documents from his possession that were related to the information he had provided or the adverse acts that were taken in response.  Accordingly, I find that Carpenito has alleged facts which causally connect the adverse acts he experienced to his exercise of his right to provide information as a witness, to satisfy this third element of a retaliation claim.

Carpenito has alleged sufficient facts to set forth retaliation claims against Westgate, Hillsgrove, Wrenn, Weefers, Anderson, Gerry, Blaisdell, Thyng, Sevier, Cox, Poulin, Mailhot, Lemieaux, Gosslin, and Vinson.  In my Simultaneous Order, I will direct service of Carpenito's retaliation claims against these defendants.

VII. Other Defendants

In addition to the defendants against whom I have authorized service, Carpenito names a number of other individuals as defendants to this action, including: C.O. Dunn, counselor Sue Taylor, C.O. Duguay, C.O. Morrison, C.O. Betteze, C.O. Labonty, Lt. Greenwald, C.O. Turcout, Lt. Emerson, Sgt. Moran, C.O. Donnally, and Lt. Gagnon.  I find that Carpenito has not

adequately alleged that these other individuals committed constitutionally impermissible acts against him during the time period addressed by this action, and I recommend therefore, that they be dismissed as defendants from this suit.

### Conclusion

For the foregoing reasons, I recommend that Carpenito's claims alleging that he was subjected to verbal threats and harassment, and denial of access to the courts, be dismissed, as Carpenito has failed to allege sufficient facts to support these claims.  I further recommend that defendants Dunn, Taylor, Duguay, Morrison, Betteze, Labonty, Greenwald, Turcout, Emerson, Moran, Donnally, and Gagnon be dismissed from this action.  In my Simultaneous Order, I will direct service of the endangerment, excessive force, and retaliation claims on the appropriate defendants.  Any objections to this report and recommendation must be filed within ten (10) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the district court's order.  See Unauthorized Practice of Law Comm. v. Gordon, 979 F.2d 11, 13–14 (1st Cir.

1992); <u>United States v. Valencia-Copete</u>, 792 F.2d 4, 6 (1st Cir.

1986).

_____

James R. Muirhead
United States Magistrate Judge

Date:      June 24, 2009

cc:        Michael Sheehan, Esq.
           James William Kennedy, Esq.
           Danielle Leah Pacik, Esq.